**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| EVELYN SLONE, | ) | CASE NO.  5:10-cv-1481 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Evelyn Slone ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying

Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On March 14, 2006, Plaintiff filed applications for DIB and SSI and alleged a disability onset date of September 21, 2004.  (Tr. 16.)  Both applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 16.)  An ALJ held Plaintiff's hearing on September 15, 2008.  (Tr. 16.)  Plaintiff appeared at the hearing, was represented by counsel, and testified.  (Tr. 16.)  A vocational expert ("VE") also appeared and testified.  (Tr. 16.)

On October 31, 2008, the ALJ found Plaintiff not disabled.  (Tr. 24.)  On May 6, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 3.)  On July 6, 2010, Plaintiff filed her complaint challenging the Commissioner's final decision.  (Doc. No. 1.)  On December 3, 2010, Plaintiff filed her Brief on the Merits.  (Doc. No. 15.)  On February 23, 2010, the Commissioner filed his Brief on the Merits.  (Doc. No. 18.)  Plaintiff did not file a Reply Brief.

Plaintiff asserts four assignments of error:[1]

(1) the ALJ failed to obtain medical expert opinion evidence to determine whether any of Plaintiff's impairments, either singly or on combination, met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings");

(2) the ALJ failed to articulate any reason or basis for his residual functional capacity ("RFC") determination that Plaintiff could perform light work, and ignored evidence that supported the conclusion that Plaintiff could not perform such work;

---

[1] Plaintiff has only two argument headings in her Brief on the Merits, but under each argument heading are two separate and distinct legal arguments.

2

(3) the ALJ made an improper assessment of Plaintiff's credibility regarding her subjective statements of pain pursuant to Social Security Ruling 96-7p; and

(4) evidence submitted to the Social Security Administration after the ALJ rendered his decision warrants remand under sentence six of 42 U.S.C. § 405(g).

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 40 years old on the alleged disability onset date (Tr. 22) and 44 years old at the time the ALJ issued his decision (*see* Tr. 24, 431).  She has a limited education and is able to communicate in English.  (Tr. 22.)  She has past relevant work as a server or waitress, which included cashiering as one of her duties.  (Tr. 460.)

### B.   Medical Evidence

The following is an account of the relevant medical evidence before the ALJ that regards Plaintiff's primary complaints of right knee pain and mental disorders, as well as additional evidence that Plaintiff introduced to the Appeals Council after the ALJ rendered his decision.

### 1.   Plaintiff's Right Knee

On February 17, 2000, Plaintiff presented to Dr. Marcy L. Dickey, D.O., at the Orthopaedic Medical Group, Inc., with a complaint of right knee pain.  (Tr. 336.)  Dr. Dickey indicated that Plaintiff reported slipping and twisting her knee while at work on January 16, 2000.  (Tr. 336.)  Plaintiff complained of burning and clicking in her knee, and reported that her knee sometimes "gave out."  (Tr. 336.)  Dr. Dickey reported upon examination that Plaintiff was not in acute distress and exhibited only minimal effusion and mild crepitus.  (Tr. 336.)  Dr. Dickey diagnosed Plaintiff with a right knee sprain with

3

possible internal derangement.  (Tr. 336.)  Dr. Dickey gave Plaintiff a Genutrain knee sleeve and a prescription for Celebrex, and instructed Plaintiff that she may return to work for light duty six hours a day.  (Tr. 336.)

Over the next several months, Plaintiff continued to present to Dr. Dickey with complaints of pain.  (Tr. 330-35.)  On March 30, 2000, Dr. Dickey reported that an MRI revealed a tear on the anterior horn of the lateral meniscus and a possible tear on the posterior horn of the medial meniscus.  (Tr. 335.)  On May 1, 2000, Dr. Dickey performed a right knee arthoscopy on Plaintiff.  (Tr. 312.)  Over the next year, Plaintiff's suffered intermittent symptoms from her surgery and Dr. Dickey reported that Plaintiff obtained only temporary improvement with injections, physical therapy, and pain medication.  (Tr. 330.)  However, Plaintiff continued to work as a server at a restaurant between 2001 and 2004.  (Tr. 74.)

On February 9, 2004, Plaintiff presented to Robinson Memorial Hospital emergency room with a complaint of right knee pain after she reportedly fell while getting out of her car.  (Tr. 181-82.)  Dr. Brian Keith Adams, M.D., attended to Plaintiff and reported effusion, mild crepitus, and tenderness along the lateral collateral ligament and the lateral joint line.  (Tr. 181.)  Dr. Adams diagnosed Plaintiff with a right knee injury that was probably a lateral collateral ligament strain versus a tear.  (Tr. 182.)  Plaintiff was given a prescription for Vicodin, and was told to take Motrin and follow up with either her orthopedic surgeon or "Dr. Peng" within the following week.  (Tr. 181.)

On September 20, 2004, Plaintiff underwent an MRI of her right knee upon referral from her physician, Dr. James Peng.  (Tr. 414.)  The MRI indicated a right knee sprain with small joint effusion that was consistent with a meniscal tear.  (Tr. 314-15.)

In April 2005, Plaintiff presented to Dr. Michael L. Pryce, M.D., with complaints of right knee pain.  (Tr. 227.)  Dr. Pryce noted that Plaintiff walked without a limp, but had a positive McMurray sign and crepitus.  (Tr. 227.)  In June 2005, Dr. Pryce reported that an MRI of Plaintiff's knee showed torn meniscii in the medial and lateral compartments.  (Tr. 225.)  On July 6, 2005, Dr. Pryce reported that Plaintiff asked for a knee brace so she could finish cosmetology school and work as a manicurist while her worker's compensation claim was pending.  (Tr. 225.)  On December 2, 2005, Dr. Pryce reported that Plaintiff had been turned down for a knee brace, but indicated that Plaintiff should resubmit her application, as well as save up money for surgery.  (Tr. 225.)  Dr. Pryce also referred Plaintiff to "Dr. Mehta" at Western Reserve Spine and Pain Center for pain management.  (Tr. 224.)

Ms. Jo Ellen Pryce, RN, indicated in a note describing Plaintiff's visit with Dr. Pryce that Plaintiff asked for a refill of Vicodin because the Oxycodone she was taking gave her headaches, and that Ms. Pryce informed Plaintiff that Plaintiff could not obtain more narcotic pain medication until ten days had passed since her last prescription. (Tr. 224.)

On December 16, 2005, Plaintiff presented to Western Reserve Spine and Pain Institute for an evaluation of her right knee pain upon referral from Dr. Pryce.  (Tr. 157-59.)  Dr. Bina Mehta, M.D., and Ms. Leann Whyte, C.R.N.P., attended to Plaintiff and indicated that Plaintiff reported the following medical history.  Plaintiff slipped on a spoon while working at Denny's on July 3, 2004 and, although she did not fall, jarred her knee.  (Tr. 157.)  She had an MRI that revealed a meniscus tear and was referred to Dr. Pryce.  (Tr. 157.)  She suffered a prior knee injury in 2000 and underwent two

5

surgeries at that time.  (Tr. 157.)  After her second surgery, she had not suffered any pain in her knee until the present injury.  (Tr. 157.)

Dr. Mehta and Ms. Whyte indicated that Plaintiff reported the following upon examination.  Plaintiff suffered constant burning and aching in her right knee that radiated down the posterior lateral aspect of her knee, and occasionally radiated up to the right hip when Plaintiff engaged in increased activity.  (Tr. 157.)  The pain was exacerbated with standing, sitting, walking, and cold weather but sometimes eased when Plaintiff lied down.  (Tr. 157.)  There was no numbness or tingling, but her pain rated at 10 out of 10 in severity and interfered with her ability to sleep.  (Tr. 157.)

Dr. Mehta and Ms. Whyte diagnosed Plaintiff with "844.9,"[2] and proscribed Plaintiff Percocet after Plaintiff signed a narcotic contract; they warned Plaintiff not to increase her medications on her own lest she be discharged.  (Tr. 159.)

On June 12, 2006, state agency consultative physician Dr. Walter Holbrook, M.D., reviewed Plaintiff's medical records and assessed her physical RFC as follows (Tr. 264-71.)  Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand and walk for at least two hours but no more than four hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  (Tr. 265-66.)  She could occasionally climb ramps and stairs; balance; and stoop.  (Tr. 266.)  She could never climb ladders, ropes, and scaffolds; kneel; crouch; or crawl.  (Tr. 266.)  She had no manipulative, visual, or communicative limitations.  (Tr. 267-68.)  As to environmental limitations, she had an unlimited ability to tolerate extreme cold, extreme heat, wetness,

---

[2] The record does not indicate what "844.9" represents.

6

humidity, noise, fumes, odors, dusts, gases, and poor ventilation; but she should avoid concentrated exposure to vibration and hazards such as machinery and heights.  (Tr. 268.)  Dr. Holbrook opined that Plaintiff could perform light work consistent with her limitations.  (Tr. 265-66.)

Also on June 12, 2006, the Social Security Administration issued a Disability Determination and Transmittal form, form SSA-831, that relied on Dr. Holbrook's Physical RFC assessment to indicate that it found Plaintiff not disabled upon initial consideration.  (Tr. 26.)

Plaintiff continued to present to Dr. Mehta and obtained prescriptions for Percocet, Vicodin, Hydrocodone, and Oxycodone from her until August 9, 2006.  (Tr. 164-79.)  For several months, Dr. Mehta indicated that the medication improved Plaintiff's quality of life (Tr. 167-79), but on July 14, 2006, Dr. Mehta indicated that Plaintiff reported more severe pain than usual (Tr. 166).  Dr. Mehta increased Plaintiff's pain medication prescription, but cautioned that she should not use more than what was prescribed.  (Tr. 166-67.)  On August 9, 2006, however, Dr. Mehta informed Plaintiff that she would no longer prescribe pain medication after Plaintiff claimed that her medication was stolen from her house but could not provide consistent details about the theft.  (Tr. 160, 164.)

On August 11, 2006, Plaintiff presented to Dr. Pryce for medication.  (Tr. 218.) Dr. Pryce did not believe that Plaintiff should have been rejected from pain management so swiftly under the circumstances and referred Plaintiff to another pain management doctor, a "Dr. Greg Moten."  (Tr. 218.)

On October 23, 2006, Dr. Pryce reported that Plaintiff had not been able to get

7

along with Dr. Moten and failed to see another doctor to whom he referred Plaintiff, so he agreed to continue Plaintiff's pain management and prescribed Vicodin and Ibuprofen with strict instructions to take the Vicodin only every twelve hours and intersperse the Ibuprofen between Vicodin doses.  (Tr. 215.)

On November 14, 2006, the Social Security Administration issued a Disability Determination and Transmittal form that relied on the opinion of state agency consultative physician Dr. Gerald Klyop, M.D., to indicate that it found Plaintiff not disabled upon reconsideration.  (Tr. 25.)

On December 27, 2006, Dr. Pryce reported that he had been able to wean Plaintiff off of Vicodin and was able get Plaintiff to rely on Darvocet and Motrin instead. (Tr. 214.)  Dr. Pryce believed that he and Plaintiff were "getting the drug problem under control," but noted that Plaintiff was "still in a lot of pain" and that Plaintiff's "physical exam is unchanged."  (Tr. 214.)

On March 7, 2007, Plaintiff presented to Dr. Pryce and Dr. Pryce reported that Plaintiff "is having terrible pain and cannot walk considerably and has to take pain medication almost continuously."  (Tr. 213.)  Dr. Pryce further reported that Plaintiff "has gained 40 pounds in weight since she's been waiting to get her knee taken care of and her ankle taken care of."  (Tr. 213.)

On August 28, 2007, Plaintiff underwent another MRI that was interpreted by Dr. Bela Ballo, M.D.  (Tr. 111-12.)  Dr. Ballo reported that the MRI showed two small tears involving the lateral meniscus, one involving the anterior horn and the other involving the posterior horn.  (Tr. 111.)  Dr. Ballo further reported that there were degenerative changes in the right knee with bone bruising and geode formation.  (Tr. 112.)

8

On November 15, 2007, Plaintiff presented to Dr. Dickey and underwent another arthoscopy on her right knee with debridement of the lateral meniscus tear and chondroplasty of the lateral compartment. (Tr. 113.) Plaintiff followed up with Dr. Dickey through April 2008 and obtained a series of injections of Euflexxa. (Tr. 115-16.) On April 8, 2008, Dr. Dickey reported that the Euflexxa injections improved Plaintiff's knee pain by 30 percent but Plaintiff's knee still hurt; and that Plaintiff wanted to attend pain management rather than undergo surgery. (Tr. 115.)

On April 24, 2008, Plaintiff presented to Dr. Steven A. Cremer, M.D., who had not seen Plaintiff since September 2007. (Tr. 134; *see* Tr. 136-37.) Dr. Cremer noted that Plaintiff had recently undergone surgery on her right knee, and that Plaintiff returned to him for further pain treatment options. (Tr. 134.) Dr. Cremer further indicated that Plaintiff reported the following. Plaintiff continued to suffer "burning, nagging, joint ache and deep discomfort." (Tr. 134.) Her pain was rated at between 6 and 10 out of 10 in severity; there was severe swelling on the lateral portion of her knee; she could not walk a full block; and she had been unable to work. (Tr. 134.) Her medial joint line pain, however, was gone. (Tr. 134.)

Upon examination, Dr. Cremer reported the following. Plaintiff has well-healed arthoscopy scars. (Tr. 134.) Her motor strength and sensation in her lower extremities were intact and there was no significant atrophy; but there was significant lateral joint line tenderness. (Tr. 134.) There was also effusion laterally on the right, and Plaintiff had an antalgic gait that favored her right side. (Tr. 134.)

Dr. Cremer's impression was that Plaintiff had degenerative knee disease that had been aggravated by a fall; persistent pain after surgery; progressive narcotic

9

dependency for function; and loss of functional ability with social isolation and lost work ability.  (Tr. 133.)  Dr. Cremer indicated that he would keep Plaintiff on Vicodin for a short term; involve Plaintiff in pool therapy; have Plaintiff use a Lidoderm patch; and possibly give Plaintiff Ambien if Plaintiff continued to have difficulty sleeping.  (Tr. 133.)

On May 22, 2008, Plaintiff returned to Dr. Cremer for a follow-up.  (Tr. 131.)  Dr. Cremer indicated that Plaintiff reported she continued to take Vicodin and had difficulty sleeping; her knee remained "really tender"; she had pain in her hip (for which Dr. Cremens suspected radiculopathy); and that she was trying to avoid a knee replacement.  (Tr. 131.)  Dr. Cremer reported upon examination that Plaintiff had a myxoid degeneration cyst; decreases ankle reflexes; negative straight leg raises; normal motor strength; and subjectively decreased sensation on the back of the right calf.  (Tr. 131.)  Dr. Cremer indicated that he would like to add a TENS unit[3] to Plaintiff's treatment regimen, as well as four doses of Ambien per week "for temporary sleep patterns, which should improve pain perception."  (Tr. 131.)

On June 19, 2008, Plaintiff presented to Dr. Cremer for a follow-up.  Dr Cremer reported that Plaintiff had a TENS unit; and that Plaintiff reported she continued to take Lidoderm and Vicodin and had improved pain perception because the Ambien helped her sleep.  (Tr. 129.)  Upon physical examination, Dr. Cremer reported that Plaintiff's physical condition remained unchanged.  (Tr. 129.)

---

[3]  "TENS" stands for "transcutaneous electrical nerve stimulation."  The Merck Manual of Diagnosis and Therapy 2495 (Mark H. Beers, MD., & Robert Berkow, M.D., eds., 7th ed. 1999).  The treatment uses low-frequency electrical currents to stimulate nerves and reduce pain.  *Id.*

### 2. Plaintiff's Mental Condition

On September 20, 2005, Plaintiff presented to Dr. Nita Arora, M.D., for a follow-up to check Plaintiff's medications.[4] (Tr. 299-300.) Dr. Arora reported the following. Plaintiff reported that she suffered "a lot of anxiety" related to a pending court case; had trouble initiating and maintaining sleep despite taking Ambien; and did not require Xanax on a daily basis but took it on Sundays when she felt more anxious. (Tr. 299.) Plaintiff further reported that, despite occasionally being tearful and irritable, her medications generally managed her mood—although she was willing to try a higher dose of Prozac for her general anxiety symptoms. (Tr. 299.)

Dr. Arora reported upon examination that Plaintiff appeared "significantly anxious," but that the rest of the examination was unremarkable. (Tr. 299.) Dr. Arora considered a diagnosis of Bipolar Disorder II with irritability versus a Major Depressive Disorder and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60.[5] (Tr. 300.) Dr. Arora recommended that Plaintiff continue taking her medication and return to the office in two to three months. (Tr. 300.)

On December 6, 2005, Plaintiff presented to Dr. Arora complaining that she had been feeling excessively aggressive and irritable, particularly in relation to her boyfriend with whom she had recently begun living. (Tr. 297.) Dr. Arora indicated that Plaintiff

---

[4] The record does not indicate when Plaintiff began a treatment relationship with Dr. Arora.

[5] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See* Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th ed. rev., 2000).

denied other psychological symptoms, and that the rest of her exam was unremarkable.

(Tr. 297.)  Dr. Arora considered whether Plaintiff had a Major Depressive Disorder

versus Bipolar Disorder, as well as Intermittent Explosive Disorder; assigned Plaintiff a

GAF score of 60; and increased Plaintiff's dosage of Prozac.  (Tr. 298)

On March 7, 2006, Plaintiff presented to Dr. Arora for a medication check and

follow-up.  (Tr. 154-55.)  Dr. Arora indicated that Plaintiff reported the following.  Plaintiff

had not been doing well.  (Tr. 154.)  She had been abusing her Percocet medication,

which she was receiving from Dr. Mehta; ran out of Percocet; had a panic attack and

suffered withdrawal; and was admitted to the emergency room for 48 hours.  (Tr. 154.)

She had "a lot of anxiety," had difficulty sleeping, and "felt somewhat more depressed";

but she denied other psychiatric or psychotic symptoms.  (Tr. 154.)  Aside from

Plaintiff's reports, Dr. Arora noted that Plaintiff's exam was unremarkable.  (Tr. 155.)

Dr. Arora assessed Plaintiff with Major Depressive Disorder versus Bipolar Disorder,

"NGAD" versus Panic, and Chemical Dependence versus Abuse.  (Tr. 155.)  Dr. Arora

also considered Intermittent Explosive Disorder.  (Tr. 155.)  Dr. Arora assigned Plaintiff

a GAF score of 50.[6]  (Tr. 155.)

On March 14, 2006, Plaintiff returned to Dr. Arora for a follow-up, and Dr. Arora

indicated that Plaintiff "is doing better."  (Tr. 152-53.)  Dr. Arora reported that Plaintiff's

sleep, appetite, energy, and concentration had all normalized; and that Plaintiff was

---

[6] A GAF score between 41 and 50 indicates serious symptoms or a serious
impairment in social, occupational, or school functioning.  A person who scores
in this range may have suicidal ideation, severe obsessional rituals, no friends,
and may be unable to keep a job.  *See* Diagnostic and Statistical Manual of
Mental Disorders 34 (American Psychiatric Association, 4th ed. rev., 2000).

compliant with her medication.  (Tr. 152.)  Dr. Arora assigned Plaintiff a GAF score of 60.  (Tr. 153.)

On June 8, 2006, state agency consultative psychologist Dr. Deryck Richardson performed a mental RFC assessment of Plaintiff and filled out a Psychiatric Review Technique form.  (Tr. 273-290.)  In his mental RFC assessment, Dr. Richardson found the following.  Plaintiff was markedly limited in her ability to interact appropriately with the general public.  (Tr. 274.)  She was moderately limited in her abilities to carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Tr. 273-74.)

On his Psychiatric Review Technique form, Dr. Richardson reviewed Plaintiff under Listing 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders).  (Tr. 277.)  Dr. Richardson concluded that Plaintiff was moderately limited in her ability to perform activities of daily living; maintain social functioning; and maintain concentration, persistence, or pace.  (Tr. 287.)  Dr. Richardson further concluded that Plaintiff had no episodes of decompensation.  (Tr. 287.)

Plaintiff continued to present to Dr. Arora between September 21, 2006, and December 18, 2007.  (Tr. 141-51.)  Throughout that time, Plaintiff's condition fluctuated.

13

Sometimes, Dr. Arora indicated that Plaintiff reported doing well (Tr. 150); and on other occasions, she reported that Plaintiff was not doing well (Tr. 141, 143, 147), had anxiety (Tr. 149), and was irritable (Tr. 141, 145).  Plaintiff reported that her Effexor medication caused many side effects including drowsiness (Tr. 147), but that her Lexapro medication did not cause side effects.  (Tr. 145.)  Dr. Arora assigned Plaintiff a GAF score that ranged between 50 and 60 throughout this time.  (Tr. 141-51.)

On August 7, 2008, Plaintiff presented to Coleman Professional for a "psychiatric visit"/"recheck" with Dr. Arora.  (Tr. 126-27.)  Dr. Arora indicated that Plaintiff reported she was "Ok" with activities of daily living and was "doing well" living alone with her cat; but had "somewhat of a hard time getting along with others" and was not doing well with her current stressors because of her "mental health issues."  (Tr. 126.)

### 3.      Plaintiff's Additional Evidence

Plaintiff submitted the following additional medical records for the first time to the Appeals Council after the ALJ rendered his decision.

On September 3 and October 15, 2008, Plaintiff presented to Coleman Professional, and Dr. Arora examined Plaintiff and reported that Plaintiff had ongoing mental issues including agitation, irritability, pan-insomnia, and feelings of helpless and hopeless.  (Tr. 398, 401.)  However, Dr. Arora reported on these occasions that Plaintiff was able to perform activities of daily living, and that Plaintiff's interpersonal functioning was "good" or "ok overall."  (Tr. 398, 401.)

On November 3, 2008, Plaintiff underwent a total right knee arthroplasty performed by Dr. Dickey.  (Tr. 382-84.)

On November 17, 2008, Plaintiff presented to the Robinson Memorial Hospital

14

emergency room for severe right leg pain.  (Tr. 386.)  Dr. Angela Robinson, D.O., attended to Plaintiff and indicated that Plaintiff reported the following.  Plaintiff's recent knee replacement and subsequent physical therapy had been going well, but Plaintiff fell with her walker into bed on the Friday before and since then had pain from her right ankle up her calf and into her knee.  (Tr. 385.)  Dr. Robinson's diagnostic impression was severe right knee pain, status post knee replacement without any evidence of a deep vein thrombosis or infection, and right ankle sprain.  (Tr. 386.)

Plaintiff continued to present to Coleman Professional between January and July 2009.  (Tr. 396-403.)  Plaintiff continued to report having periods where she isolated herself, stayed in bed, and felt anxiety, hopeless, and helpless; however, Plaintiff also continued to report that she could perform activities of daily living and function with others.  (Tr. 396-403.)

On June 11, 2009, Plaintiff presented to Dr. A.M. Gash[7] at the Streetsboro Chiropractic Clinic with complaints of low back pain.  (Tr. 411.)  Dr. Gash treated Plaintiff for the next two months.  (Tr. 416-21.)  Through July 2009, Dr. Gash indicated that Plaintiff reported her back pain had improved.  (Tr. 419-21.)

    **D.**    **Hearing Testimony**

        **1.**    **Plaintiff's Testimony**

Plaintiff testified to the following at her hearing.  Plaintiff lived alone in a mobile home.  (Tr. 431.)  She lived with her sister for a short time before that.  (Tr. 431.)  Her right knee pain began after her injury at work in 2000; and although she was able to

---

[7] The record does not clearly indicate Dr. Gash's credentials.

work after that initial injury, her knee condition deteriorated. (Tr. 435-36.) She did not have problems with her left knee. (Tr. 435.)

Plaintiff had knee pain every day. (Tr. 437.) The weather (dampness and cold), standing, and sitting for long periods of time caused her knee to hurt. (Tr. 436-37.) She could stand for only 30 seconds before her knee began to hurt, and she could stand still for about 10 minutes before she needed to sit. (Tr. 436.) If she moved around, she could stand for 15 to 20 minutes. (Tr. 437.)

Plaintiff had used a TENS unit and medication to relieve her knee pain (Tr. 437), although she stopped using the TENS unit because she found that it did not help her pain (Tr. 450). She had a dependency and withdrawal problem with Percocet, but she was subsequently taking Vicodin and she did not have any problems with it. (Tr. 437.)

Plaintiff could lift and carry her cat, which weighed 22 pounds. (Tr. 438.) But she had trouble going up and down stairs and squatting, and she could not bend at the waist. (Tr. 440-41.) She also had trouble walking and balancing because her knee would give out on her. (Tr. 441.)

As to daily activities, Plaintiff's sister helped Plaintiff often, depending on how Plaintiff felt. (Tr. 442.) Plaintiff could not vacuum, but she could use a broom to sweep. (Tr. 442.) She could not make her bed. (Tr. 442.) She could put dry clothes in the washing machine and fold dried clothes, but she could not lift wet clothes from the washing machine. (Tr. 442.) She prepared her own meals, although the meals were usually pre-cooked microwave meals. (Tr. 443.) She watched television and sometimes crocheted. (Tr. 443.) She had a driver's license and drove a car (using her left foot for the brake); went to church about twice a week in the morning; sometimes

16

played bingo at church and visited her sister; and went to the grocery store by herself

(in the middle of the night because she did not have patience).  (Tr. 443-47.)

Plaintiff also suffered anxiety and depression and has problems around

strangers.  (Tr. 447.)

### 2.    The VE's Testimony

The ALJ presented the following hypothetical person to the VE:

> I'd like you to assume an individual the same age, education[,] and work
> experience as the claimant.  I want you to further assume that this person
> could lift and/or carry 20 pounds occasionally, 10 pounds frequently.  That
> this person needed a sit/stand option, in other words the ability to change
> positions from sitting to standing at at least 30 minute intervals.  This person
> is only occasionally able to climb ramps and stairs, not able to climb ladders,
> ropes, scaffolds.  This person is occasionally able to balance . . . .  No
> kneeling, no crouching, no crawling.  This person needs to avoid work
> environments with vibration or hazards such as dangerous machinery or
> heights.  This person is able to perform, understand, remember[,] and carry
> out simple instructions only, [and] cannot work at a job that required,
> demands a rapid pace . . . [a]nd is only able to interact with the general
> public superficially.

(Tr. 460-61.)  The VE testified that such a person could not perform Plaintiff's past

relevant work, but could perform work as a mail clerk (for which there were 1,450 jobs

in the local economy, 7,200 in the state economy, and 167,000 in the national

economy), bench assembler (for which there were 5,000 jobs in the local economy,

50,000 in the state economy, and 752,000 in the national economy), and charge

account clerk (for which there were 2,300 jobs in the local economy, 11,500 jobs in the

state economy, and 330,000 jobs in the national economy).  (Tr. 462.)

Plaintiff's counsel posed the following, different hypothetical person to the VE:

> Assume that we have an individual with the same age, education[,] and work
> experience as the claimant.  She is capable of performing sedentary work,
> however this is reduced by only occasional overhead reach, occasional

17

forward reach.  No interaction with the general public, limited to superficial interaction with her coworkers and limited superficial interaction with the supervisors[;] simple, routine tasks with no quotas.  She would need to prop her leg at a 90 degree angle at least half the day and she would have episodes of decompensation at least once a week due to extreme anxiety which would cause her to miss at least half a workday.  One day per week.

(Tr. 463.)  The VE testified that such a person could not perform Plaintiff's past relevant work, and would have trouble sustaining full-time work and would need a special accommodation for propping her leg.  (Tr. 463.)

Plaintiff's attorney then asked whether her hypothetical person would have "difficulties sustaining" if she were off task at least one-third of the time based on moderate limitations in social interaction and concentration, persistence, and pace; and the VE responded that the hypothetical person would.  (Tr. 464.)

## III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981).*  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

18

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2007.

2.   The claimant has not engaged in substantial gainful activity since September 21, 2004, the alleged onset date.

3.   The claimant has the following severe impairments: right knee degenerative joint disease; status post hernia repair; a depressive disorder; and an anxiety disorder.

19

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; with a sit/stand option at 30 minute intervals; with the ability to occasionally climb ramps and stairs; no able to climb ladders, ropes, scaffolds; occasionally able to balance; unable to kneel, crouch, or crawl; must avoid a work environment with vibration or hazards such as dangerous machinery or heights; able to understand, remember, and carry out only simple instructions; cannot work at a job that requires a rapid pace; and only able to interact occasionally with the general public superficially.

6. The claimant is unable to perform any past relevant work.

. . . . .

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 21, 2004 through the date of this decision.

(Tr. 18-23.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      The ALJ's Analysis of the Listings**

Plaintiff argues that Social Security Ruling 83-19[8] requires that a physician

---

[8]  Social Security Ruling 83-19 provides, in relevant part the following:

> Under the concept of medical equivalence, a physician designated by the Secretary is required to decide whether the medical findings of an individual's impairment(s), although not specifically described by any listed set of medical criteria in the listing, are at least medically equal to one of the listed sets.

S.S.R. 83-19, 1983 WL 31248, at *2.

designated by the Social Security Administration decide whether a claimant's impairments meet or medically equal an impairment in the Listings, and that the ALJ erroneously failed to obtain medical expert opinion evidence when he determined that Plaintiff's impairments did not meet or medically equal an impairment in the Listings. The Commissioner responds that the record contains two forms SSA-831-U5[9] that were signed by state agency consultative physicians Dr. Holbrook and Dr. Klyop, respectively; that the ALJ's determination regarding the Listings is supported by those forms SSA-831-U5; and, therefore, the ALJ did not need additional medical expert testimony.  The Court agrees with the Commissioner and finds that Plaintiff's assignment of error lacks merit.

As an initial matter, Social Security Ruling 83-19 has been rescinded.  S.S.R. 91-7c, 1991 WL 231791, at *1.  Plaintiff has not addressed this and has not explained how the recision affects an ALJ's responsibility to obtain medical expert opinion evidence when determining whether a claimant's impairments meet or medically equal an impairment in the Listings.

Moreover, a state agency consultative physician's medical opinion is considered an expert opinion, Social Security Ruling 96-6p, 1996 WL 374180, at *1, and a state agency consultative physician's signature on a "Disability Determination and Transmittal" form is proof that a physician designated by the Social Security Administration considered whether the claimant's impairments meet or medically equal an impairment in the Listings at the initial and reconsideration levels of administrative

---

[9] A form SSA-831-U5 is otherwise known as a Disability Determination and Transmittal form.  S.S.R. 96-6p, 1996 WL 374180, at *3.

22

review.  S.S.R. 96-6p, at *3; *Curry v. Sec'y of Health & Human Servs.*, No. 87-1779,
1988 WL 89340, at *5 (6th Cir. Aug. 29, 1988) (citing *Fox v. Heckler*, 776 F.2d 738, 742
(7th Cir. 1985)).  An ALJ may rely upon such expert opinions to determine whether a
claimant meets a listing requirement.  *Candela v. Astrue*, 1:10-cv-1603, 2011 WL
3205726, at *9 (N.D. Ohio July 28, 2011) (citing S.S.R. 96-6p, at *3 *and Curry*, 1988
WL 89340, at *5); *Branch v. Astrue*, 4:10-cv-485, 2010 WL 5116948, at *8 (N.D. Ohio
Dec. 9, 2010) (same).

　　Here, the record contains Disability Determination and Transmittal forms signed
by Dr. Klyop (Tr. 25), and referring to Dr. Holbrook's physical RFC assessment (Tr. 26).
Plaintiff has not explained how these forms are insufficient as medical expert opinion
evidence supporting the ALJ's determination that Plaintiff's impairments do not meet or
medically equal an impairment in the Listings.

　　Plaintiff also contends that the ALJ "does not even attempt to articulate why
Plaintiff's condition does not equal the requirements" of Listing 1.02A.  (Pl.'s Br. 14.)
The Court disagrees.  Listing 1.02A regards major dysfunction of one or more major
peripheral weight-bearing joints (*i.e.*, the hip, knee, or ankle) that results in an inability
to ambulate effectively.  Listing 1.02A.  The ALJ stated in his decision that Plaintiff's
impairments did not meet or medically equal Listing 1.02A because "the claimant
remains able to ambulate effectively."  (Tr. 19.)  This explanation directly addresses the
requirements of Listing 1.02A and why the ALJ concluded that Plaintiff did not meet that
Listing.

　　Plaintiff has not explained how the ALJ's analysis of the Listings was otherwise
deficient.  Therefore, this assignment of error lacks merit.

### C.     The ALJ's RFC Assessment

Plaintiff argues that the ALJ "fail[ed] to articulate any reasoning or cite any basis for his conclusion that Plaintiff can perform light work and his decision lacks any meaningful discussion of the evidence."  (Pl.'s Br. 9.)  The Court disagrees, as the ALJ clearly discussed Plaintiff's medical evidence regarding her impairments and medications, Plaintiff's hearing testimony that included her activities of daily living, and the opinions of the state agency consultants to conclude that Plaintiff could perform light work.  (Tr. 20-22.)

Plaintiff also argues that the ALJ "ignored" some evidence of Plaintiff's visits to Dr. Pryce and Dr. Cremer that consistently documented symptoms and treatment for Plaintiff's pain.  The Court disagrees.  The ALJ cited medical records from Dr. Pryce and Dr. Cremer in his decision.  (Tr. 21, *citing* Exs. 148F, 149F, *and* 159F from Dr. Pryce, *and* Ex. 244F from Dr. Cremer.)  Moreover, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party," *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).

Plaintiff does not explain how the evidence from Dr. Pryce and Dr. Cremer to which the ALJ cited and upon which he relied was inadequate to support his decision, or how any failure to address other evidence from Dr. Pryce and Dr. Cremer documenting Plaintiff's symptoms and treatment was detrimental to Plaintiff.  As Plaintiff's contentions that the ALJ provided no reasoning for his RFC determination and ignored Dr. Pryce's and Dr. Cremer's records are unsupported and belied by a reading of the ALJ's decision, these assignments of error lack merit.

24

**D.    The ALJ's Assessment of Plaintiff's Credibility**

Plaintiff contends that the ALJ did not properly assess the credibility of Plaintiff's

subjective statements regarding the severity of Plaintiff's knee pain pursuant to the

requirements of Social Security Ruling 96-7p.   For the following reasons, the Court

disagrees.

Credibility determinations regarding a claimant's subjective complaints rest with

the ALJ.  *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir.

1987).  The ALJ's credibility findings are entitled to considerable deference and should

not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d

461, 463 (6th Cir. 1987).  However, "[i]f an ALJ rejects a claimant's testimony as

incredible, he must clearly state his reasons for doing so."  *Felisky v. Bowen*, 35 F.3d

1027, 1036 (6th Cir. 1994).  The ALJ's decision must contain specific reasons for his

finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the claimant and to any subsequent reviewers the

weight he gave to the individual's statements and the reasons for that weight.  S.S.R.

96-7p, 1996 WL 374186, at *1.

In determining the credibility of a claimant's statements, an adjudicator must

consider the entire case record, including the objective medical evidence, the claimant's

own statements about symptoms, statements and other information provided by

treating or examining physicians or psychologists and other persons about the

symptoms and how they affect the individual, and any other relevant evidence in the

case record.  *Id.*  Although a claimant's description of her physical or mental

impairments, alone, is "not enough to establish the existence of a physical or mental

25

impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence," S.S.R. 96-7p, at *1.  The ALJ must consider the following factors:

     (i)     [D]aily activities;

     (ii)    The location, duration, frequency, and intensity of . . . pain;

     (iii)   Precipitating and aggravating factors;

     (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

     (v)    Treatment, other than medication, . . . received for relief of . . . pain; and

     (vi)   Any measures you use or have used to relieve . . . pain.

S.S.R. 96-7p, at *3; *Felisky*, 35 F.3d at 1039-40.  Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility.  20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

     Here, the ALJ found Plaintiff's subjective complaints of her knee pain not fully credible because Plaintiff's knee pain had not precluded Plaintiff from engaging in physical activities such as attending church on a regular basis; going shopping late at night; playing bingo (which required her to be around people and sit or stand for prolonged periods); driving (which required her to sit for prolonged periods); and attending cosmetology school during a portion of the time for which she alleged disability.  (Tr. 21.)  Moreover, the ALJ noted that Plaintiff admitted that she could stand for 15 to 20 minutes at a time, lift her 22 pound cat, and sit and stand in alternate

positions.  (Tr. 21.)  The ALJ also discussed Plaintiff's surgical treatments, medication, and use of a TENS unit for relief of her pain.  (Tr. 20-21.)  In short, the ALJ's decision contains specific reasons for his finding on Plaintiff's credibility that are supported by the evidence in the case record, and that are sufficiently specific to make clear the weight he gave to Plaintiff's statements and the reasons for that weight.  Plaintiff has not explained how the ALJ's reasons are inadequate to support his credibility assessment.

Plaintiff seems to suggest that the ALJ erred because he did not *discuss* certain factors.  But Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed*, and Plaintiff has not cited any authority providing that an ALJ must exhaustively discuss every factor of his analysis.  To the contrary, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."  *Kornecky, 167 F. App'x at 508* (quoting *Loral Def. Sys.-Akron, 200 F.3d at 453*).

The ALJ's decision is sufficiently thorough, clear, and specific for the Court to conclude that the ALJ considered those factors required under the Code of Federal Regulations and the Social Security Rulings.  Accordingly, remand is not appropriate.  *See Shkabari v. Gonzales, 427 F.3d 324, 328 (6th Cir. 2005)* (quoting *Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir.1989)*) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### E.    Plaintiff's Additional Evidence

Plaintiff contends that remand is warranted under sentence six of 42 U.S.C. §

27

405(g) for the Social Security Administration to consider additional evidence that was not submitted to the Social Security Administration before the ALJ rendered his decision.  For the following reasons, the Court disagrees.

Sentence six of 42 U.S.C. § 405(g) permits a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the Commissioner.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994).  Evidence is "new" only if it was not in existence or available to the claimant at the time of the administrative proceeding.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Evidence is "material" only if there is a reasonable probability that the Commissioner would have reached a different conclusion on the claimant's disability claim if presented with the new evidence.  *Id.*  "Good cause" is shown  by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Id.*  The burden of showing that remand is appropriate is on the claimant.  *Id.*

Here, Plaintiff contends that her additional evidence is new because it was obtained after the ALJ rendered his decision; and that there was good cause for not obtaining the evidence earlier and incorporating it into the record before the Social Security Administration because the additional evidence documents a new and/or worsening condition.

Plaintiff has not explained how her additional evidence is material.  Moreover, Plaintiff's explanation for good cause is not persuasive, as "[e]vidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial."  *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir.

1992).  Accordingly, the Court is not persuaded that remand under sentence six of 42 U.S.C. § 405(g) is warranted.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 18, 2011